UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No.: 22-17842-PDR |
| Debtors.[1] | (Jointly Administered) |

_____/

| | |
|---|---|
| VITAL PHARMACEUTICALS, INC. and JHO INTELLECTUAL PROPERTY HOLDINGS, LLC, | |
| Plaintiffs, | Adv. Pro. No. _____ |
| v. | |
| ORANGE BANG, INC., and MONSTER ENERGY COMPANY, | |
| Defendants. | |

_____/

**MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to rule 56 of the Federal Rules of Civil Procedure, made applicable to the above-captioned adversary proceeding (this "Adversary Proceeding") under rules 7001 and 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Debtors Vital Pharmaceuticals, Inc. ("VPX") and JHO Real Estate Investment, LLC ("JHO" and, together with VPX, "Plaintiffs") respectfully bring this motion (this "Motion") requesting that this Court enter an order granting

---

[1]   The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019) (collectively, the "Debtors").

summary judgment in favor of Plaintiffs on Count I and Count II of Plaintiffs' *Debtors' Adversary Complaint for Declaratory Judgment* filed simultaneously herewith (the "<u>Complaint</u>"), and granting such other and further relief as is just and proper.  As grounds for the relief requested in this Motion, Plaintiffs rely on the *Declaration of Elizabeth A. Morris in Support of Debtors' Motion for Summary Judgment and Incorporated Memorandum of Law* (the "<u>Morris Declaration</u>") filed concurrently herewith and respectfully state as follows:

## PRELIMINARY STATEMENT

1.        The Debtors are marketing and selling their business to maximize recoveries for all stakeholders.  In order to do so, the Debtors, and bidders, need confirmation that any purchaser will be able to conduct that business on the same fundamental basis as the Debtors—including by having the same freedom to use the Debtors' BANG trademark.  The Debtors' freedom of use of that mark is based on their election to pay a perpetual fee of 5% of net sales to Defendants, pursuant to an arbitration award confirmed in federal court.  Defendants, however, have asserted that this fee regime will not apply to, and cannot be assigned to, a purchaser without Defendants' consent.

2.        Defendants' position is bizarre.  Defendants themselves litigated for—in fact affirmatively requested—imposition of the fee structure.  They have demanded that fees be paid during these cases.  And they stand to benefit substantially from any purchaser's election to continue to pay to use the BANG mark freely.  Their current resistance is against their own self-interest except to the extent Defendants can win concessions by withholding consent—and then later yield.  The Court should not entertain this gamesmanship.

3.        More importantly, Defendants' position is baseless.  The fee regime will apply to any purchaser as a matter of law.  The fee regime is part of a confirmed arbitral award.  It is a term that now attaches to the use of the Debtors' Bang mark in conjunction with the Debtors' business—

11939168-2

whether operated by the Debtors or a purchaser of that business.[2]  Even if res judicata did not resolve the issue, the fee regime established pursuant to the award is property of the Debtors' estates.  The Debtors are entitled to sell that property, like all other debtor property, pursuant to Section 363 of the Bankruptcy Code.  And, even if the fee regime under the award is viewed as a contract—which it is not—the Debtors would still be permitted to assign that contract without Defendants' consent pursuant to Section 365 of the Bankruptcy Code.

4.       Finally, Defendants' position is dangerous.  It is an obstruction to the Debtors' marketing and sale process.  Uncertainty over the ability of a purchaser to inherit the "pay to play" fee regime creates uncertainty over the business and its value.  That uncertainty will very likely negatively impact offers and the ultimate purchase price, if not promptly resolved.

5.       Accordingly, the Plaintiff Debtors seek summary judgment in respect of declarations that (a) res judicata precludes Defendants from contesting a purchaser's right to avail itself of the fee regime and, (b) in any event, the fee regime is property of the Debtors' estates subject to transfer without Defendants' consent in accordance with the Bankruptcy Code.

## JURISDICTION AND VENUE

6.       Plaintiffs commenced the Adversary Proceeding pursuant to sections 541(a), 363, 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 7001(2) and 7001(9).

7.       The Court has jurisdiction over the Adversary Proceeding under 28 U.S.C. §§ 157 and 1334.  The Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b) because it arises under the Bankruptcy Code and arises in a case under the Bankruptcy Code.

8.       Venue of the Chapter 11 Cases and the Adversary Proceeding, as well as adjudication of this Motion, is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]    The Debtors have appealed confirmation of the Award and reserve all rights in respect of the same.

9.      In accordance with Bankruptcy Rule 7008(a), Plaintiffs consent to the entry of a final order or judgment on this Motion by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## BACKGROUND

### A.      The 2010 Settlement Agreement

10.      Plaintiff VPX and Defendant Orange Bang both sell drink products branded "Bang" and own U.S. trademark rights to the "Bang" mark.  In 2009, Orange Bang commenced an action in the United States District Court for the Central District of California against VPX alleging, in summary, that VPX violated the Lanham Trade-Mark Act, 15 U.S.C. § 1051 et seq. (the "Lanham Act") because its use of the word "Bang!" on a bodybuilding product infringed upon Orange Bang's trademark registrations for its own "Bang" mark (the "2009 Action").

11.      On August 11, 2010, VPX and Orange Bang resolved the 2009 Action by entering into a confidential settlement agreement (the "2010 Settlement Agreement").  *See* Morris Decl. Ex. 1.  In general, the 2010 Settlement Agreement set forth certain permissible channels (for both VPX and Orange Bang) for then-existing "Bang" branded products, and provided that: (i) VPX was permitted to use VPX's version of the "Bang" mark (the "Bang Mark") regardless of trade channel for products that meet certain criteria, and (ii) VPX was permitted to use the Bang Mark within specified trade channels for products that meet other criteria.  *See id*.  In particular, the 2010 Settlement Agreement sets forth certain marketing and sales restrictions relating to the parties' respective "Bang" marks (collectively, the "Paragraph 7 Restrictions").  *See id*., at ¶¶ 7A–7D.

12.      The Paragraph 7 Restrictions provide, in relevant part:

(a)      Without restriction, VPX may use the Bang Mark to market and sell "nutritionally fortified," "creatine-based" dietary supplement and nutritional products (the

4

"Creatine-Based Products").  *Id.* ¶¶ 7A–7C.

(b)    VPX may also use the Bang Mark to market and sell "any nutritionally fortified beverage which enhances performance, and which is not creatine-based" (the "Paragraph 7D Products"), but only through "vitamin and nutritional supplement stores to include but not limited to GNC, Vitamin Shoppe, other specialty vitamin and nutrition stores, gyms and health clubs or to the vitamin and dietary supplement section only of any convenience or other stores" (the "Nutritional Channel").  *Id.* ¶ 7D.

13.    The 2010 Settlement Agreement "bind[s] and inure[s] to the benefit of the Parties [t]hereto and their respective agents, servants and employees, their successors, predecessors and assigns of each of them, separately and collectively."  *Id.* ¶ 14.  VPX and Orange Bang are original parties to the 2010 Settlement Agreement, *id.* § I; JHO has been adjudicated a successor-in-interest of VPX under the 2010 Settlement Agreement, s*ee* Morris Decl. Ex. 2 Final Arbitration Award (the "Award") § III.X at 162; and nine years after the 2010 Settlement Agreement was executed, and unknown to VPX at the time, Orange Bang assigned to Monster all of its rights and interest in the 2010 Settlement Agreement, while purporting to retain all rights and interest in the Bang Mark, including Orange Bang's trademark rights.  *See* Award § II.M at 42.  Notwithstanding Orange Bang's purported assignment of the claims related to the settlement agreement (and retention of its trademark rights to the Bang Mark), Monster and Orange Bang agreed to split any recoveries on all claims—including trademark-related claims—equally.  *See id.*

**B.    VPX's Assignment of the Bang Mark**

14.    On July 13, 2017, VPX assigned the Bang Mark to JHO, with JHO becoming the registered owner.  VPX then entered into a Trademark License Agreement with JHO for the right to use the Bang Mark.  *See* Order Compelling Arbitration 10-11, D.C. ECF No. 50.

### C.    The Arbitration

15.    On June 16, 2020, Defendants served a joint demand for arbitration upon VPX (with JHO subsequently added), wherein Monster asserted breach of contract claims as assignee of the 2010 Settlement Agreement and Orange Bang asserted trademark infringement claims as to the Bang Mark.  *See* Morris Decl. Ex. 3.  Defendants asserted that Plaintiffs' use of the Bang Mark in connection with their line of Bang energy drink products (the "Bang Products" or "Bang Energy"), launched after the execution of the 2010 Settlement Agreement, violated the 2010 Settlement Agreement and infringed on Orange Bang's rights in its own "Bang" mark.  *See id*.

16.    The arbitration (the "Arbitration") final hearing took place via Zoom from October 4 to October 14, 2021.  *See* Award at 4 (Preamble).  The Arbitration "[w]as administered by a neutral third-party virtual bailiff" and considered "the evidence, exhibits, demonstratives, testimony, and arguments of the parties."  Award at 4–5 (Preamble).  The arbitrator, Bruce Isaacs (the "Arbitrator"), also considered several closing arguments, including closing arbitration briefs, closing reply briefs, post-hearing briefs, including a fully-briefed motion to clarify an interim arbitration award (issued on January 6, 2022), and oral arguments post-dating the interim arbitration award and pre-dating the final arbitration hearing.  *See id.*  Defendants assert that they "had a full and fair opportunity to present [their] case during the eight-day hearing," "submitted post-hearing briefs and reply briefs, and then appeared for a second round of closing arguments before [the Arbitrator]," whom they assert "issued a well-reasoned decision that extensively evaluated the evidence and applicable law."  Morris Decl. Ex. 4 ("Mot. to Confirm Award") ¶ IV.B at 14–15.

### D.    The Award

17.    The Arbitrator issued the Final Arbitration Award (i.e., the Award) on April 4, 2022.  *See* Award at pp. 4–5 (Preamble).  The Award states that it is "a full and final adjudication

6

of all claims which were, or which could have been, submitted to the arbitrator by any and all of the parties in connection with th[e A]rbitration." *Id.* § V at 177.

18.     Among the "core disputes" in the Arbitration was whether the Bang Products are Creatine-Based Products or Paragraph 7D Products.  If the Bang Products are Paragraph 7D Products, then VPX allegedly was in breach of the 2010 Settlement Agreement by marketing and selling the Bang Products outside the Nutritional Channel.  *See* Award § II.F at 31.  According to the Arbitrator, even Orange Bang's trademark-related claims turned on whether the Bang Products are Paragraph 7D Products because the 2010 Settlement Agreement "is essentially an agreement not to sue for trademark infringement" as long as VPX stays its "agreed upon lane."  Award § II.L at 41 n.8.  Indeed, the entire Arbitration, according to the Arbitrator, "turn[ed] on whether or not the B[ang] Products, and VPX's other products which make use of the B[ang] [M]ark, are 'creatine-based' or not, whether that results in a breach of the [] Settlement Agreement or not and whether that rises to the level of trademark infringement or not."  Award § II.O at 44.

19.     The Arbitrator concluded that "in order for a product to be 'creatine-based' within the meaning of . . . the [] Settlement Agreement, creatine must be a fundamental, a main or a carrying ingredient in that product."  Award § III.A at 48.  The Arbitrator further concluded that creatine was not a fundamental, a main, or a carrying ingredient in the Bang Products at issue.  Award § III.B at 57. Ultimately, the Arbitrator determined that the Bang Products are not Creatine-Based Products, but rather Paragraph 7D Products subject to the Paragraph 7 Restrictions.  Award § III.F at 63.

20.     Based on this determination, the Arbitrator awarded Defendants a choice to collect monetary damages to "address[] the issue of past harm" relating either to Defendants' breach of contract claims or their trademark infringement claims.  Award § III.O at 141 (emphasis in original); *see also id.* § IV.A at 174 (the alternative past monetary component of the Award, which

Defendants jointly elected, awarded "past damages from VPX and JHO through September 19, 2021" as "a disgorgement of profits attributable to infringement of the B[ang] [M]ark in the amount of $175 million.").

21.     The Arbitrator also issued a permanent injunction severely restricting VPX's ability to use the Bang Mark (the "Permanent Injunction"), an equitable remedy directed toward the Bang Products to address "potential future harms which are separate, independent, and distinct from the compensatory damages awarded in [the] Award to recompense [Orange Bang] for" past harm. Award § III.O at 141.  However, the Arbitrator also permitted Plaintiffs to opt for an alternative equitable remedy (the "Continuing Fee Election"), which consists of:

(a)     the entry of an indefinite stay of enforcement on the Permanent Injunction so long as Plaintiffs pay the Continuing Fee (as defined below); and

(b)     the creation of an obligation to pay Defendants (5%) of the Bang Products' net sales, due quarterly (the "Continuing Fee").  *See* Award § III.S at 150; *see also id.* § IV.B at 175.

22.     Should Plaintiffs ever fail to pay the Continuing Fee, "the Permanent Injunction shall automatically take effect without the need for any further action by a court or by an arbitrator."  Award § U at 157.

23.     In sum, the Continuing Fee Election, and the Continuing Fee Election alone, grants Plaintiffs the right to continue using the Bang Mark so long as Plaintiffs continue to make the quarterly Continuing Fee payments to Defendants.  The Continuing Fee Election imposes no obligation on Plaintiffs to conform to any quality standards in connection with Plaintiffs' use of the Bang Mark.  Nor does the Continuing Fee Election impose an obligation on Defendants to prescribe or enforce quality control standards.  Orange Bang likewise has no quality control rights—under the Continuing Fee Election or otherwise—over Plaintiffs' use of the Bang Mark.

24.     The Arbitrator made several findings and conclusions regarding the binding effect of the Award on parties using the Bang Mark in connection with the Bang Energy business in the future:

(a)     The Arbitrator predicated imposition of liability on JHO on the conclusion that when JHO took assignment of the Bang Mark from VPX, any use restrictions already applicable to VPX with regard to the mark necessarily traveled to JHO.  Award § III.X 164 n.48 ("JHO itself obtained its initial grant of rights regarding the Bang tradename from VPX via a 2017 assignment . . . Because JHO's Bang rights derive from a grant of rights from VPX, and because JHO is a successor-in-interest to VPX in this regard, JHO's Bang rights are likewise subject to the [use restrictions set forth in] Settlement Agreement.").  In other words, the conditions for JHO's use of the mark in harmony with Orange Bang's mark transferred to JHO together with the Debtors' Bang Mark itself.

(b)     The Award made the Permanent Injunction binding on Plaintiffs as well as several other categories of persons, including any of Plaintiffs' "officers, agents, servants, employees, successors, and assigns, and all those persons acting in active concert or participation with them" (the "Categories of Persons Bound").  Award § III.O at 135–36.

(c)     The Arbitrator intended for "VPX and JHO and Categories of Persons Bound to comply with the [Continuing Fee]" and thus "render[] the need for the Permanent Injunction unnecessary in the first place."  Award § III.P at 144.  Indeed, as the Arbitrator reasoned, "corporate entities like VPX and JHO operate through living and breathing people and therefore all of these Categories of Persons Bound should be bound by the Permanent Injunction, otherwise the Permanent Injunction is an empty basket which provides no practical protection and does not serve its intended purposes."  Award § III.Q at 145.

(d)    The Arbitrator held that determining whether a particular person "fall[s]" within the Categories of Persons Bound" was a "determination to be made by a court at the appropriate time in a subsequent proceeding . . . because the [A]rbitrator does not have jurisdiction to make such binding specific adjudications." *Id.* (noting that "[t]he opportunity to be heard in a subsequent proceeding will protect VPX's due process rights in this regard.").

### E.    Entry Of Judgment Confirming Award

25.    On April 6, 2022, Defendants moved in the United States District Court for the Central District of California (the "District Court")[3] to confirm the Award. *See* Mot. to Confirm Award ¶ I at 1.  Under the 2010 Settlement Agreement, the District Court could only confirm the Award if it had subject matter jurisdiction over the claim or controversy resolved by the Arbitrator. *See* Settlement Agreement ¶ 18.a.   This jurisdiction was confirmed by the District Court's confirming the Award. *See generally* Morris Decl. Ex. 5 ("Order Confirming Award").

26.    The Award, as confirmed by the District Court, arises under and is governed by California law.

27.    In their Motion to Confirm Award, Defendants further argued that the District Court had subject matter jurisdiction to confirm the Award because:

(a)    The Arbitration involved federal claims over which the District Court had original jurisdiction; to wit: "claims for trademark infringement and false designation of origin under the Lanham Act."  Mot. to Confirm Award ¶ IV.A.1 at 12.

(b)    The District Court had supplemental jurisdiction over the remaining Arbitration claims, including Defendants' breach of contract claim, because they were "part of the same case or controversy as" Defendants' federal claims. *Id.*

---

[3]    The District Court Action is captioned *Vital Pharms., Inc. and JHO Intellectual Prop. Holdings, LLC v. Orange Bang, Inc. and Monster Energy Co.*, No. 5:20-cv-1464 (the "District Court Action").

28.     On September 29, 2022, the District Court entered the Award as a judgment in the District Court Action, *see* Morris Decl. Ex. 6 (the "<u>Judgment</u>") at 1 ("[T]he Final Arbitration Award entered by Bruce Isaacs . . . on April 4, 2022 . . . shall have the same force and effect as a civil judgment rendered by this Court.").

29.     While Plaintiffs have appealed (the "<u>Appeal</u>") the District Court's entry of the Judgment, *see* Morris Decl. Ex. 7 ("<u>Notice of Appeal</u>"), the fact remains that, under the current circumstances, the Debtors are entitled to use the Bang Mark without restriction, including to market and sell the Bang Products.

### F.     The Chapter 11 Cases

30.     On October 10, 2022, each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors' Chapter 11 Cases are being jointly administered.

31.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108, 11 U.S.C. §§ 1107, 1108.

32.     On November 1, 2022, the Office of the United States Trustee (the "<u>U.S. Trustee</u>") appointed the official committee of unsecured creditors (the "<u>Committee</u>") [ECF No. 245].  On November 23, 2022, the U.S. Trustee reconstituted the Committee [ECF No. 400].  No request has been made to the Court to order the appointment of a trustee or examiner.

33.     On January 12, 2023, the Court entered a final order (the "<u>Final DIP Order</u>") [ECF No. 638] authorizing the Debtors to obtain postpetition financing under the *Superpriority Secured Debtor-in-Possession Credit Agreement* (the "<u>DIP Agreement</u>").  To avoid an event of default under the DIP Agreement, the Debtors are required to achieve certain milestones (the "<u>DIP Milestones</u>"), including, among other things, designating a stalking horse bidder on or before March 13, 2023, holding an auction, if necessary, on or before April 19, 2023, and closing a sale

of all or substantially all of the Debtors' assets on or before May 17, 2023. *See* Final DIP Order

¶ 46; Final DIP Order, Ex. B (DIP Agreement) § 5.18.

34.    On January 27, 2023, in accordance with the DIP Milestones, the Debtors filed the

Bid Procedures Motion,[4] seeking, among other things, authority to sell all or substantially all of

the Debtors' assets upon the conclusion of the Debtors' marketing and sale process. This Court

has scheduled a hearing on the Bid Procedures Motion for February 23, 2023, at which hearing the

Court will consider approval of proposed bidding procedures, pursuant to which the Debtors will

solicit and select the highest or otherwise best offer for their assets.

35.    As stated in the Bid Procedures Motion, the Debtors are seeking authority to sell

all or substantially all of their assets. *See* ECF No. 707. The Bang Products account for roughly

95% of the Debtors' total sales, making them the Debtors' best-selling products. Accordingly,

Plaintiffs' interest in the Bang Mark, including the scope of Plaintiffs' rights under the Continuing

Fee Election, are essential in order for any potential purchaser to value the Debtors' business in

connection with the Debtors' sale process. Defendants' threat of new litigation will likely

meaningfully and adversely affect the amount that any potential buyer will be willing to offer for

the business.

## **LEGAL STANDARD**

36.    Reviewing courts "shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see* Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56); *Celotex*

---

[4] *Debtors' Motion for an Order (I) Approving (A) Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Procedures for the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) the Form and Manner of Notice of the Sale Hearing, Assumption Procedures, and Auction Results, (D) Dates for an Auction and Sale Hearing, (E) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, and (F) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Authorizing the Debtors to Provide Bid Protections, and (III) Granting Related Relief* [ECF No. 707]

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (holding that summary judgment is a favored procedure).  "An issue of fact is 'material' if it might affect the outcome of the case under the governing law[, and] it is 'genuine' if the evidence could lead a reasonable jury to find for the non-moving party." *Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1375 (S.D. Fla. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

37.    The existence of some factual dispute will not defeat summary judgment; rather, the requirement is that no *genuine* issue of *material* fact exists.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added); *Celotex Corp.*, 477 U.S. at 327 (holding that when a movant's evidence demonstrates the lack of a genuine issue, the burden shifts to the opposing party to demonstrate the existence of a genuine issue for trial).

38.    "Rule 56 of the Federal Rules of Civil Procedure contemplates 'that a court may grant summary judgment without the parties having conducted discovery.'" *Edgewater House Condo. Assoc. v. City of Ft. Lauderdale*, 825 F. App'x 658, 664 (11th Cir. 2020) (citing *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 844 (11th Cir. 1989) (per curiam).

## ARGUMENT

39.    The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Additionally, "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  *Id.*    To satisfy the "case or controversy" requirement, the plaintiff must allege facts from which it appears that there is a "substantial likelihood that he will suffer injury in the future."  *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1211 (11th Cir. 2019).

40.     Here, Plaintiffs—and the Debtors more generally—have an urgent need to determine the scope of their rights under the Award, and more specifically, the Continuing Fee Election.  The Bid Procedures Motion seeks to establish March 13, 2023 as the deadline for the Debtors to seek approval of a Stalking Horse Bid (as defined in the Bid Procedures Motion) and April 11, 2023 as the deadline for interested parties to submit bids.  Without the requested relief, the Debtors face the risk of impairment of their impending sale process because potential buyers may alter the consideration they are willing to pay, or decline to bid entirely, absent certainty regarding their ability to operate the business with the Continuing Fee Election in place.

41.     Declaratory judgment is therefore appropriate to allow the Debtors' proposed sale process to continue in accordance with the Debtors' obligations under the Final DIP Order.  Accordingly, the Court should enter a declaratory judgment finding that any buyer of Plaintiffs' rights in the Bang Mark is entitled to continue selling Bang Products as long as it pays the Continuing Fee because (a) Defendants are precluded from relitigating their rights in the Bang Mark under the doctrine of res judicata and (b) Plaintiffs can assign their rights under the Continuing Fee Election under sections 363 or 365 of the Bankruptcy Code.

## I.     DEFENDANTS ARE PRECLUDED FROM RELITIGATING THE USE OF THE BANG MARK

42.     "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).  Under the doctrine of claim preclusion, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit."  *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1246 (11th Cir. 2014).  "Federal law governs the question whether a prior federal court judgment based on federal question jurisdiction is res judicata in a case also brought under federal question jurisdiction."  *U. S. v. Ringley*, 750 F. Supp 750, 755 (W.D. Va. 1990); *see also Baloco*, 767 F. 3d at 1246 ("Federal

14

courts must apply federal common law to determine the preclusive effect of a prior federal court judgment.").

43.     "A claim is barred by res judicata, i.e., claim preclusion, when (1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases." *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 30 F. 4th 1079, 1083 (11th Cir. 2022) (citing *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999) (quotes omitted).[5]

44.     The District Court, exercising federal question jurisdiction, entered the Judgment confirming the Award in favor of Defendants as against Plaintiffs, and imposing a specific remedy for any prospective infringement caused by continued use of the Bang Mark: the 5% Continuing Fee.  Accordingly, for the reasons set forth below, Defendants are precluded from arguing that a buyer of the Bang Mark cannot use the mark in accordance with the terms of the Continuing Fee Election.

### A.     The Award, As Confirmed By The Judgment, Is A Final Judgment On The Merits

45.     "[A] judgment confirming an arbitration award, once entered, has the same force and effect as a judgment in a standard civil action and is subject to all the provisions of law relating to those judgments." *AIG Baker Sterling Height, LLC v. Am. Multi-Cinema, Inc.*, 579 F.3d 1268,

---

[5]   The standard is the same in the Ninth Circuit.  *See Rein v. Providian Fin. Corp.*, 270 F.3d 895, 899 (9th Cir. 2001) ("Claim preclusion is appropriate where: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) there was a final judgment on the merits; and (4) the same claim or cause of action was involved in both suits.").  To the extent the Court determines California's res judicata doctrine applies, the California state law standard only differs with respect to defining "claim" for purposes of the final element.  *See Gonzales v. Cal. Dep't of Corr.*, 739 F.3d 1226, 1232 (9th Cir. 2014) ("As opposed to the federal 'transactional' theory of claim preclusion, California courts employ the 'primary rights' theory to determine what constitutes the same cause of action for claim preclusion purposes.").  Notably, the Eleventh Circuit treats the 'primary rights' and 'transactional' claim theories interchangeably.  *See Citibank N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1503 (11th Cir. 1990).  Accordingly, there is no material difference in the res judicata standard as between Eleventh Circuit, Ninth Circuit, or California state law for purposes of this Motion.

1272 (11th Cir. 2009) (citing 9 U.S.C. § 13) (emphasis omitted); *accord Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1094 & n.1 (9th Cir. 2011) (same).    Similarly, "when a federal district court enters a judgment confirming an arbitration award pursuant to the Federal Arbitration Act, that judgment has res judicata effect as to all matters adjudicated by the arbitrators and embodied in their award." *Apparel Art Int'l, Inc.* v. *Amertex Enters. Ltd.*, 48 F.3d 576, 585 (1st Cir. 1995); *accord NTCH-WA, Inc. v. ZTE Corp.*, 921 F.3d 1175, 1180 (9th Cir. 2019), *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir. 1985); *see also* Restatement (Second) of Judgments § 84(1) (1982).

46.     Here, the Award was fully adjudicated before the arbitrator.    Thereafter, the District Court entered a judgment "in favor of Defendants and against Plaintiffs as set forth in the Final Arbitration Award entered by Bruce Isaacs, Arbitrator, on April 4, 2022. . . . The Final Arbitration Award shall have the same force and effect as a civil judgment rendered by this Court."    *See* Judgment, D.C. ECF No. 127.

## B.    The Award Was Rendered by a Court of Competent Jurisdiction

47.     "A court of competent jurisdiction is a court with the power to adjudicate the case before it."  *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 91-92 (2017).

48.     The Arbitrator and the District Court had the power to adjudicate the cases before them.    Paragraph 18 of the 2010 Settlement Agreement granted the Arbitrator exclusive jurisdiction over any dispute between the parties related to the 2010 Settlement Agreement or the 2009 Litigation, and that "[j]udgment on any [arbitration] award . . . may be entered in any court having jurisdiction over the subject matter of the controversy."    2010 Settlement Agreement ¶ 18(a).  This jurisdiction was confirmed by the District Court's order compelling the Arbitration. *See* Order Compelling Arbitration, D.C. ECF No. 50.   The District Court had subject-matter

jurisdiction over enforcing the Award in accordance with the Court's order compelling the Arbitration and thus had jurisdiction to confirm. *See id.*; *see also PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1305 (11th Cir. 2016) ("It is by now undisputed that when a federal district court grants a motion to compel arbitration it retains jurisdiction to confirm or vacate the resulting arbitration award under 9 U.S.C. §§ 9–10.") (internal quotes omitted).

### C.    Any Buyer, As Assignee Of Plaintiffs' Rights In The Bang Mark, Will Be In Privity With Plaintiffs

49.    "Privity—for the purposes of applying the doctrine of res judicata—is a legal conclusion designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved." *U. S. v. Schimmels (In re Schimmels)*, 127 F.3d 875, 881 (9th Cir. 1997) (citing *Sw. Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 94 (5th Cir. 1977) (quotes omitted). "Privity is a flexible concept dependent on the particular relationship between the parties in each individual set of cases." *FTC v. Garvey*, 383 F.3d 891, 897 (9th Cir. 2004). "Privity exists between parties who adequately represent the same legal interests. It is the identity of interest that controls in determining privity, not the nominal identity of the parties." *See Va. Sur. Co. v. Northrop Grumman Corp.*, 144 F.3d 1243, 1247 (9th Cir. 1998).

50.    Privity "traditionally[] arose from a limited number of legal relationships in which two parties have identical or transferred rights with respect to a particular legal interest," *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1053 (9th Cir. 2005). "A variety of relationships between two parties can give rise to the conclusion that a nonparty to an action is 'in privity' with a party to the action for purposes of the law of judgments, which is simply a shorthand way of saying that the nonparty will be bound by the judgment in that action." *Int'l Nutrition Co. v. Horphag Rsch., Ltd.*, 220 F.3d 1325, 1329 (Fed. Cir. 2000). "One situation in which parties have frequently been held to be in privity is when they hold successive interests in the same

17

property." *Id.*  "Thus, a judgment with respect to a particular property interest may be binding on a third party based on a transfer of the property in issue to the third party after judgment." *Id.*[6] Courts routinely find privity where "a nonparty acquires assets of a defendant-infringer." *Kloster Speedsteel AB v. Crucible Inc.*, No. 85-2174, 1986 WL 721181, at *21 (Fed. Cir. June 11, 1986).

51.    *Brunswick Corp. v. Chrysler Corp.* illustrates how privity works when, as here, intellectual property rights are assigned from one party to another.  408 F.2d 335 (7th Cir. 1969). In *Brunswick*, a consent judgment—which the Seventh Circuit concluded was a final adjudication by the district court—determined that the Kiekhaefer Corporation had title to patents that were being infringed on by the West Bend Company's manufacture and sale of the Tiger Shark 800 outboard motor and requiring West Bend to pay royalties.  After the consent judgment was entered, the Brunswick Corporation purchased Kiekhaefer's assets, and Chrysler purchased West Bend's assets.  Later, Chrysler argued it was not bound by the consent judgment because the privity requirement was not satisfied.  The Seventh Circuit disagreed:  "In the case at bar, Chrysler purchased from The West Bend Company the entire business that was devoted to the production of 'Tiger Shark 800' outboard motors and the inboard-outboard stern drives used with such motors. Furthermore, The West Bend Company, having ceased all operations in the field of outboard motors, transferred both its manufacturing and sale facilities and also its personnel to Chrysler. It follows that Chrysler does stand in the shoes of The West Bend Company with respect to the decree." *Id.* at 338.

52.    Here, there can be no reasonable dispute that privity applies as between Plaintiffs and any buyer of substantially all of the Debtors' assets.  Plaintiffs have an ownership interest in

---

[6]   This principle is also set forth in Section 43 of the *Restatement (Second) of Judgments* (the "Restatement"), which states that "[a] judgment in action that determines interests in real or personal property, [w]ith respect to the property involved in the action[, h]as preclusive effects upon a person who succeeds to the interests of a party to the same extend as upon the party himself." *Restatement (Second) of Judgments* § 43(1)(b).

the Bang Mark, which is federally registered to JHO.[7]  Plaintiffs' interests in the Bang Mark, and the parameters of its use, were adjudicated on a final basis under the Award.  This privity is demonstrated by the District Court's determination that both VPX and JHO were subject to the Arbitration because VPX "assigned its right in the trademark 'B[ang]' to JHO [and] VPX then entered into a Trademark License Agreement with JHO on July 13, 2017 for the right to use the Bang word mark."  *See* Order Compelling Arbitration 10-11, D.C. ECF No. 50.

53.     The Bid Procedures Motion contemplates the sale of all or substantially all of the Debtors' assets, *see* Bid Procedures Motion D.I. 707, and any purchase pursuant thereto will almost certainly include Plaintiffs' intellectual property, including Plaintiffs' rights in the Bang Mark, goodwill, and other intangible assets associated with the broader business of the Debtors. By purchasing Plaintiffs' rights to the Bang Mark, along with the goodwill and business related thereto, including those assets belonging to the other Debtors, any buyer would necessarily be in privity with VPX and JHO with respect to the Bang Mark and the related infringement issues adjudicated under the Award.

---

[7]   *See* Registration Nos. 3545129 (Nutritional supplements and ready to drink nutritionally fortified beverages.); 5884629 (Ready to drink coffee beverage; iced coffee and coffee based beverages; ready to drink flavored coffee; beverages with coffee base); 6933743 (All purpose sports bags; All-purpose athletic bags; All-purpose carrying bags; Animal carriers; Athletic bags; Attaché cases; Backpacks; Baggage tags; Bags for carrying animals; Bags for carrying babies' accessories being diaper bags; Bags for carrying pets; Bags for sports; Bags for umbrellas; Beach bags; Belt bags; Billfolds; Book bags; Briefcases; Business card cases; Card wallets; Carry-all bags; Change purses; Clutches; Coin purses; Cosmetic carrying cases sold empty; Credit card cases; Credit card holders; Credit card wallets; Diaper bags; Duffel bags; Evening bags; Evening handbags; Fanny packs; Fashion handbags; Fitted protective covers for handbags, briefcases, valises, suitcases, and briefcase-like portfolios; Fitted protective covers for luggage; Garment bags for travel; Grip bags; Gym bags; Handbags; Hip bags; Hobo bags; Key cases; Key pouches; Key wallets; Knap sacks; Labels of leather; Leather and imitation leather bags; Leather bags; Leather bags and wallets; Leather bags, suitcases and wallets; Leather briefcases; Leather credit card holder; Leather credit card wallets; Leather handbags; Leather purses; Luggage; Luggage label holders; Luggage tags; Make-up bags sold empty; Make-up cases sold empty; Men's clutch bags; Messenger bags; Name card cases; Overnight bags; Overnight cases; Overnight suitcases; Plastic luggage labels; Pocket wallets; Pocketbooks; Purses; Satchels; Shoulder bags; Sling bags; Sports bags; Suitcases; Toiletry cases sold empty; Tote bags; Travel bag organizer inserts specially adapted to travel bags; Travel bags; Travel cases; Umbrella covers; Umbrellas; Valises; Waist bags; Walking sticks; Wallets.).

**D.     Any Infringement Claims Against a Buyer Would Be the Same Cause of Action Adjudicated Under the Award**

54.     "In the Eleventh Circuit, the principal test for determining whether the causes of action are the same is whether the primary right and duty are the same in each case.  In determining whether the causes of action are the same, a court must compare the substance of the actions, not their form." *Ragsdale*, 193 F.3d at 1239 (quoting *Citibank* , 904 F.2d at 1503  (quotes omitted).  That is, "a court must look to the factual issues to be resolved in the second cause of action, and compare them with the issues explored in the first cause of action." *Citibank*, 904 F.2d at 1503.  "If a case arises out of the same nucleus of operative facts, or is based upon the same factual predicate, as a former action, the two cases are really the same 'claim' or 'cause' of action' for purposes of res judicata." *Griswold*, 598 F.3d at 1293.

55.     The Arbitration and resulting Award addressed the claim of whether Orange Bang had trademark interests in the Bang Mark that were infringed upon, and if so, the amount of damages for such infringement.  Award at p. 67.  As previously stated, the Debtors contemplate selling substantially all of their assets, including their rights in the Bang word mark, goodwill, and other intangible assets associated with the Debtors' business, as well as the Debtors' distribution network, production facilities, marketing apparatus, and every other component that goes into successfully marketing and selling Bang Products.  In other words, the same business will be run by a new operator.  Any future lawsuit by Defendants against a purchaser asserting infringement by the purchaser's operation of the same business in the same manner would rely on the same facts.  That the defendant's name might change in such a lawsuit does not alter the substance of the action and the reality that it would arise from the same nucleus of operative facts and be based upon the same factual predicate.

56.     Accordingly, any future claims brought by Defendants against a purchaser would involve the identical claim considered by and ruled upon by the Arbitrator.

11939168-2

## II.    PLAINTIFFS' RIGHTS UNDER THE CONTINUING FEE ELECTION ARE ASSIGNABLE PROPERTY RIGHTS

### A.    The Continuing Fee Election Is Estate Property

57.    Under the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1). As in other circuits, the Eleventh Circuit holds that the "scope of [section] 541(a)(1) is broad, and includes property of all types, tangible and intangible." *In re Meehan*, 102 F.3d 1209, 1210 (11th Cir. 1997).  "Whether a debtor's interest constitutes property of the estate is a federal question, but we look to non-bankruptcy law to decide whether the debtor had a legal or equitable interest in the property when he filed for bankruptcy." *In re Thomas,* 516 Fed. Appx. 875, 877 (11th Cir. 2013) (citing *Bracewell v. Kelley (In re Bracewell)*, 454 F. 3d 1234, 1243 (11th Cir. 2006)) (internal quotes omitted).

58.    It is well established that the Debtors' rights created under prepetition judgments and arbitration awards constitute estate property under section 541(a) to the extent such rights benefit the estate.  *See*, *e.g.*, *In re Tradewinds Airlines, Inc.*, No. 08-20394-(AJC), 2009 WL 393858, *2 (Bankr. S.D. Fla. Feb. 10, 2009) ("the right to attempt to collect on the Judgment [is] property of the [] bankruptcy estate"); *In re Mehlhaff*, 491 B.R. 898, 902 (8th Cir. 2013) (stating that "the estate succeeds to all rights under [a prepetition] judgment").

59.    Here, the Continuing Fee Election entitles Plaintiffs, based on Plaintiffs' own election, to continue "the sale of Bang branded products . . . on an ongoing, continuing basis in the future as set forth [in the Award] and for so long as VPX or JHO make any use of the Bang [M]ark" (the "Continuing Fee").  Award at 175.  This right is estate property, which, like any other kind of property, is subject to ongoing obligations and restrictions and remains unchanged by the bankruptcy process.

**B.  Plaintiffs' Rights Under Continuing Fee Election Can Be Assigned Under Section 363(b) of the Bankruptcy Code**

60.  Section 363(b) of the Bankruptcy Code allows the debtors in possession, after giving proper notice, to sell property of the estate outside the ordinary course of business.  *See* 11 U.S.C. § 363(b).  It is axiomatic that section 363(b)(1) is an "enabling statute[] that give[s] the trustee the authority to sell or dispose of property if the debtors would have had the same right under state [or applicable nonbankruptcy] law."  *In re Schauer*, 835 F.2d 1222, 1225 (8th Cir. 1987).

61.  Here, the Award was entered in California, and the District Court confirming the Award is located in California as well.  California, like most United States jurisdictions, "maintains a policy encouraging the free transferability of all types of property."  *Essex Ins. Co. v. Five Star Dye House, Inc.*, 137 P.3d 192, 195 (Cal. 2006); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (noting the "common law's refusal to permit restraints on the alienation of chattels"); *see also* Cal. Civ. Code § 1044 ("Property of any kind may be transferred, except as otherwise provided in this Article.").

62.  Plaintiffs do not contest that the conditions necessary to maintaining the Continuing Fee Election will remain enforceable as to any assignee, and nothing in the Award or under nonbankruptcy law prohibits Plaintiffs from transferring their rights under the Continuing Fee Election subject to the Award's terms.  Indeed, the Continuing Fee Election imposes only one obligation on Plaintiffs: that they continue to pay the Continuing Fee in accordance with the terms of the Award.  The Award does not permit Defendants to revoke or modify the Continuing Fee Election, nor does it impose any obligations on Plaintiffs other than to pay the Continuing Fee as long as they sell Bang Products.

63.  Thus, the Continuing Fee Election is an estate asset that may be transferred subject to the sole condition that the Continuing Fee continues to be paid by the purchaser.

III. **THE CONTINUING FEE ELECTION IS NOT AN EXECUTORY CONTRACT, BUT TO THE EXTENT THAT IT IS, IT CAN BE ASSUMED AND ASSIGNED BY PLAINTIFFS**

A. **The Continuing Fee Election Is Not A Contract And Therefore Is Not An Executory Contract**

64.     Section 365 does not define the term "contract," but "[c]ourts agree that the phrase 'executory contract' cannot be applied to a judicial order." *In re Bennet Enters., Inc.*, 628 B.R. 481, 487 (Bankr. D.N.J. 2021) (quoting *Roxse Homes, Inc. v. Roxse Homes Ltd. P'ship*, 83 B.R. 185, 187 (D. Mass. 1988)).  Arbitration awards, once confirmed by a United States District Court, are judicial orders.  *See* 9 U.S.C. § 13; *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (stating that "confirmation of an arbitration award . . . merely makes what is already a final arbitration award a judgment of the court").

65.     For the reasons discussed in Section I(A), supra, the Award is a final arbitration award confirmed by the District Court, and is therefore is a judicial order.  *See* Judgment, D.C. ECF No. 127 ("The Final Arbitration Award shall have the same force and effect as a civil judgment rendered by this Court").  Accordingly, "[a]lthough it has certain characteristics of something 'executory,'" the Continuing Fee Election, created by the Award, "is not a contract." *In re Shoen*, 193 B.R. 302, 314 (D. Ariz. 1996).  Instead, the Arbitrator "has imposed [the] obligation[s]" under the Continuing Fee Election "by judgment."  *Id.*

B. **If The Continuing Fee Election Is An Executory Contract, It Is Not A Trademark License**

66.     To the extent the Court determines that the Continuing Fee Election is in fact an executory contract, Plaintiffs can assume and assign it under section 365 of the Bankruptcy Code. To be clear, Plaintiffs do not dispute that "the substantial weight of authority holds that under federal trademark law, trademark licenses are not assignable in the absence of some express authorization from the licensor, such as a clause in the license agreement itself." *See In re Trump*

*Ent. Resorts, Inc.*, 526 B.R. 116, 123 (Bankr. D. Del. 2015).  But the Continuing Fee Election is not a trademark license, and is therefore not subject to this rule.

67.      It is "well settled" that for there to be a trademark license requires showing that "(1) a grant of [the registered owner of the trademark's] permission to use its mark and (2) retention of quality control by [the registered owner of the trademark] over [the debtor's] use of the mark."  *See In re Travelot Co.*, 286 B.R. 447, 455 (Bankr. S.D. Ga. 2002); *see also Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 921 (C.D. Ill. 2000) (stating that the two elements of a trademark license are "the grant of a limited right to use the mark [and] the obligation to maintain quality standards").

68.      The Continuing Fee Election is not a trademark license because Orange Bang did not grant permission to use the mark and Orange does not retain *any* quality control over Plaintiffs' use of the Bang Mark.

### 1.      Plaintiffs' Right To Use The Mark Comes From A Judicial Order, Not Orange Bang's Grant Of Permission

69.      As discussed in Section III(A) above, Orange Bang did not grant Plaintiffs a right to use the Bang Mark.  Rather, the Continuing Fee Election authorizes Plaintiffs to use its Bang Mark in a more expansive way than it otherwise might have been able to use it.

### 2.      Orange Bang Has No Quality Control Rights Over Plaintiffs' Use Of The Mark

70.       "The owner of a trademark has a duty to ensure the consistency of the trademarked good or service . . . The purpose of a trademark, after all, is to identify a good or service to the consumer, and identity implies consistency and a correlative duty to make sure that the good or service really is of consistent quality, i.e., really is the same good or service." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989)).  Simply put, quality control provisions obligating trademark licensees to maintain certain quality standards set by the registered

24

owner and allowing the owner to enforce those standards when it becomes necessary to do so are not merely terms typical of, but nonessential to, trademark licenses.  Rather, they are indispensable to the Congressional purpose underlying the Lanham Act.

71.     The Continuing Fee Election imposes no obligation on Plaintiffs to conform to any quality standards or on Defendants to prescribe and enforce quality control standards.   As previously stated, Plaintiffs are free to use the Bang Mark without fear of a Defendant-sought permanent injunction as long as they continue to pay the Continuing Fee.  The Continuing Fee Election imposes no other obligations on either Plaintiffs or Defendants beyond this requirement, including granting Orange Bang quality control rights over Plaintiffs' use of the Bang Mark.

72.     Indeed, if the Continuing Fee Election constituted a trademark license, its failure to provide Orange Bang any powers of quality control over Plaintiffs' Bang branded products would render it a "naked license," with the potentially catastrophic result of imperiling Orange Bang's ability to enforce its rights in the Bang Mark more broadly and leading to a finding that it has abandoned the mark.  *See Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1098 (9th Cir. 2013); *see also FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010) ("Naked licensing occurs when the licensor fails to exercise adequate quality control over the licensee.").

73.     Accordingly, the Continuing Fee Election cannot be a trademark license. Otherwise it would be a "naked license" and Orange Bang would be estopped from asserting its rights in the Bang Mark.  *See Hotko Kinoko Co.*, 738 F.3d 1085 ("Where a trademark owner licenses the use of its mark but does not provide for the continued quality control of the goods and services sold under the mark, the trademark may cease to function as a useful marker of the product's quality or source. When this happens, the owner is said to have abandoned the mark by issuing a "naked license," and is estopped from asserting rights in the trademark.").

**C.**     **If The Continuing Fee Election Is A Trademark License, The General Policy Reasons For Prohibiting Non-Consensual Assignment Of Trademark Licenses Does Not Apply**

74.     When engaging with the general prohibition on assigning trademark mark licenses without the licensor's consent, "it is not sufficient to simply recognize a general ban on contract assignment under the applicable non-bankruptcy law, the Court must understand why the applicable non-bankruptcy law bans assignment." *See In re Trump Ent. Resorts, Inc.*, 526 B.R. at 123. "[F]ederal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor." *See id.* at 124.

75.     Here, the general policy considerations behind courts' proclivity to require a licensor's express consent before a debtor licensee can assume and assign a trademark license do not apply.  As noted above, the Continuing Fee Election fails to impose any quality control obligations on Plaintiffs.  Nor does Orange Bang retain any rights to impose quality control on Plaintiffs' products.  Indeed, Plaintiffs are permitted under the Continuing Fee Election to continue selling their products where they are completely different from Orange Bang's products: Orange Bang's primary product is a "whipped, frothy and sugar loaded orange-flavored drink sold out of a fountain dispenser," Award 7, while VPX's Bang branded energy drinks are "sugarless and caffeine laden."  Award 73.  To be clear, the point here is not to relitigate the issue of whether Plaintiffs infringed on Orange Bang's mark; rather, the point is that Plaintiffs sell a completely different product without any requirement to conform to any standards set by Orange Bang.

76.     The essential policy that trademark law seeks to promote is "to inform potential buyers who makes the goods on sale. . . . Knowledge of origin may convey information about a product's attributes and quality, and consistent attribution of origin is vital when vendors' reputations matter.  Without a way to know who makes what, reputations cannot be created and

26

11939168-2

evaluated, and the process of competition will be less effective." *Top Tobacco, L.P. v. N. Atl. Op. Co.*, 509 F.3d 380, 381 (7th Cir. 2007).  The Continuing Fee Election cedes any right of Orange Bang to control Plaintiffs' manufacture and sale of Bang branded products in order to avoid confusion.  Indeed, the Arbitrator determined that Orange Bang established a likelihood of confusion as between Orange Bang's "Orange Bang" product and the VPX Bang branded products." Award 79-80.  Thus, by granting the Continuing Fee Election, the Arbitrator rendered irrelevant any of the concerns of customer confusion that trademark law's general prohibition against non-consensual assignments seeks to protect against.

77.     Because the only policy considerations that generally apply have to do with allowing the trademark holder to control quality in order to prevent customer confusion, Orange Bang does not have any cognizable interest in prohibiting Plaintiffs from assigning its rights under the Continuing Fee Election.  Rather, the only rights Orange Bang has under the Continuing Fee Election is to receive the Continuing Fee or, if it does not receive the Continuing Fee payments, to enjoin the sale of Bang branded products—regardless of whether the sellers are Plaintiffs or their assignees.  Orange Bang has no other rights or obligations.  Either the buyer will pay the Continuing Fee or be enjoined from selling Bang branded products.  In either case, Orange Bang's rights and interests under the Continuing Fee Election will be fully protected.

## CONCLUSION

78.     For all the foregoing reasons, Plaintiffs respectfully request that the Court enter an order granting the relief requested in this Motion and such other and further relief as may be just

11939168-2

and proper.

Dated:  February 17, 2023
        Miami, Florida

George A. Davis (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
       tj.li@lw.com
       brian.rosen@lw.com
       jon.weichselbaum@lw.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  whit.morley@lw.com

Respectfully submitted,

*/s/ Jordi Guso*
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
       mniles@bergersingerman.com

*Co-Counsel for Plaintiffs*