UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No.: 22-17842-PDR |
| Debtors.¹_____/ | (Jointly Administered) |
| VITAL PHARMACEUTICALS, INC. and JHO INTELLECTUAL PROPERTY HOLDINGS, LLC, | |
| Plaintiffs, | Adv. Pro. No. 23-01031-PDR |
| v. | |
| ORANGE BANG, INC., and MONSTER ENERGY COMPANY, | |
| Defendants._____/ | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Debtors Vital Pharmaceuticals, Inc. ("VPX") and JHO Real Estate Investment, LLC ("JHO" and, together with VPX, "Plaintiffs") hereby reply (this "Reply") in further support of their *Motion for Summary Judgment and Incorporated Memorandum of Law* [ECF No. 2] (the "Motion")² and in response to the joint objection to the Motion [ECF No. 31] (the "Objection")

---

¹ The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019) (collectively, the "Debtors").

² Capitalized terms used but not otherwise defined in this Reply have the meanings given to such terms in the Motion or the Award (as defined in the Motion), as applicable.

filed by Defendants. In support of this Reply, Plaintiffs, by and through their undersigned counsel, respectfully state:

## PRELIMINARY STATEMENT

1. Defendants have no path to victory in this dispute: the 5% Continuing Royalty Election is freely assignable whether or not it is a trademark license. To begin with, the Award does *not* create a trademark license, and so Defendants have no basis to assert a consent right. Moreover, even if the Award did create a trademark license, it could only be a highly unusual "compulsory" trademark license. And *that* trademark license is assignable without consent both because that is the nature of a compulsory license *and* because none of the policy reasons behind non-assignability under trademark law are present in this case.

## ARGUMENT

**I.    THE ARBITRATION AWARD DID NOT CREATE A TRADEMARK LICENSE**

2. Every trademark license must have "(1) a grant of [the owner's] permission to use its mark and (2) retention of quality control by [the owner] over [the grantee's] use of the mark." *See In re Travelot Co.*, 286 B.R. 447, 455 (Bankr. S.D. Ga. 2002); *see also Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 921 (C.D. Ill. 2000) (stating that the two elements of a trademark license are "the grant of a limited right to use the mark [and] the obligation to maintain quality standards"). The Award satisfies neither of these elements and thus cannot be a trademark license.

**A.    The Award Does Not Grant Permission to Use Defendants' Mark**

3. Defendants argue that the first factor is satisfied because the remedy permits Plaintiffs to use Orange Bang's mark and Defendants consented to it. *See* Obj. ¶ 36. Plaintiffs do not dispute that Defendants accepted imposition of the remedy. But the remedy imposed by the

Award permits Plaintiffs to continue using *Plaintiffs'* own mark as long as they pay the 5% Continuing Royalty; it does not give Plaintiffs a license to use *Orange Bang's* mark.

      **i.**      **Plaintiffs Own Their Mark Separate and Apart from Orange Bang's Mark**

4.      Defendants argue that Plaintiffs do not own the Bang mark used on Plaintiffs' products. *See* Obj. ¶ 10. That is demonstrably and obviously wrong. There are two marks—Orange Bang's mark and Plaintiffs' mark. As the Arbitrator recognized, Plaintiffs have trademark registrations for their own mark,[3] and Plaintiffs have rights associated with their mark. Moreover, "[a] trademark is merely a symbol of goodwill. Thus, goodwill and its trademark symbol are inseparable and cannot be separated without invalidating both." *In re Impact Distributors, Inc.*, 260 B.R. 48, 54 (Bankr. S.D. Fla. 2001). Goodwill, in turn, is "the total of all the imponderable qualities that attract customers to a business." *See Newark Morning Ledger Co. v. U.S.*, 507 U.S. 546, 555 (1993). That is, goodwill is unique to the business, and although the Award found that Plaintiffs were liable for trademark infringement, it did not simply erase these features unique to Plaintiffs' mark. In other words, it did not determine that the goodwill symbolized by Plaintiffs' mark was simply the same as the goodwill symbolized by the Orange Bang mark.

      **ii.**      **The Award Does Not Permit Plaintiffs to Use *Orange Bang's* Mark**

5.      Defendants' argument that the Award permits Plaintiffs to use *Orange Bang's* mark is also wrong. Although the Award refers to a singular "Bang mark," it clearly recognizes the existence of two separate marks with different characteristics. *See, e.g.*, Award 73 (looking at "the similarity of the marks" and noting that "the use of the marks is somewhat different"). The theory underlying the Award is not that Plaintiffs infringed by misappropriating—or "counterfeiting"—Orange Bang's mark. *See, e.g.*, *Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 911 (S.D.

---

[3] *See* Award 10 ("On December 9, 2008, VPX obtained a trademark registration for the mark 'BANG' in International Class 5.").

12022119-2

Ohio 2014); *see also Laukus v. Rio Brands, Inc.*, 391 Fed. App'x 416, 425 (6th Cir. 2010) (noting that "counterfeit" is defined as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark") (citing 15 U.S.C. § 1127). Rather, the Award determined that Plaintiffs' use of their own mark infringed on Orange Bang's mark by being confusingly similar. *See* Award 79 ("The arbitrator concludes that Orange Bang has established a likelihood of confusion as between Orange Bang's 'Orange Bang' product and the VPX Bang branded products"). The Award's finding of infringement is not the same thing as finding the nonexistence of Plaintiffs' mark altogether. Nor is it the same thing as finding that Plaintiffs do not own their (allegedly) infringing mark.[4]

6. Moreover, interpreting the Award to conclude that infringement occurred through the use of Orange Bang's mark would lead to the absurd result that the putative license is also a *license to use Orange Bang's mark*, rather than Plaintiffs' mark. If so, then the Award expressly authorizes Plaintiffs to sell products using the entirety of Orange Bang's mark, including its logo, without fear of further litigation. But common sense dictates that this would be an absurd result, and certainly not the result contemplated by the Arbitrator or, presumably, desired by Orange Bang. *See United States v. DBB, Inc.*, 180 F.3d 1277, 1283 (11th Cir. 1999) (citation omitted) (explaining that, to interpret an ambiguous provision, courts should "consider the purpose, the subject matter and the condition of affairs which led to its enactment, and so construe it as to effectuate and not destroy the spirit and force of the law and not to render it absurd"); *In re Mahoney,* 251 B.R. at 754 ("Judgments are to be construed like other written instruments.").

---

[4] *See, e.g.*, *Mytee Prods., Inc. v. Shop Vac Corp.*, 2013 WL 5945060, at *3 (S.D. Cal. Nov. 4, 2013) ("Defendant does not claim to have any interest in the 'MYTEE' mark; rather, Defendant asserts that Plaintiff has no interest in the trademark 'MIGHTY.' But this argument is irrelevant to the question at issue. Plaintiff does not need to establish an ownership interest in the allegedly infringing mark. Rather, Plaintiff must establish an ownership interest in its own mark and then show that Defendant's mark is so similar as to be confusing."); *Quicksilver, Inc. v. Kymsta Corp.*, 360 Fed. App'x. 886, 890 (9th Cir. 2009) (affirming district court's issuance of permanent injunction, but limiting the injunction to allow defendant limited use of its mark).

### iii. The Award Imposes an Ongoing Royalty for Continued Infringement Through Use of Plaintiffs' Mark, Not a License to Use Orange Bang's Mark

7. Defendants place great weight on the Award's use of the term "compulsory license," and argue that this demonstrates the Arbitrator's intent to impose a consensual license. As an initial matter, calling the 5% Continuing Royalty a license—compulsory or not—was a mistake. Compulsory licenses are impermissible under federal trademark law,[5] something Defendants implicitly acknowledge by referencing the complete lack of case law involving *any* valid, judicially imposed trademark licenses. *See* Obj. ¶ 44. But, what is more telling is the term that the Award uses repeatedly: *continuing royalty*, a term very similar to *reasonable* or *ongoing royalty*, which is a well-known term of art under patent law. And, indeed, in fashioning the 5% Continuing Royalty Election, the Award looked directly to patent law decisions. *See* Award 148-49.

8. Cases considering patent law make clear that an ongoing or reasonable royalty is different from a compulsory license. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313 n.13 (Fed. Cir. 2007) ("We use the term ongoing royalty to distinguish this equitable remedy from a compulsory license."). More specifically, ongoing royalties are imposed as compensation for *infringement*, not as bargained-for consideration for permission to use the claimant's patent to avoid infringement. *See id.* at 1314-15 (noting that royalties are to "effectuate a remedy" for "ongoing infringement"). Likewise, in *Apple, Inc. v. Samsung Elecs. Co.*, which was cited by the Arbitrator, the court imposed ongoing royalties after "Apple ha[d] not received compensation for any continuing infringement by Samsung." 2014 WL 6687122, at *13 (N.D. Cal. Nov. 25, 2014)

---

[5] *See The Apollo Theater Foundation, Inc. v. W. Int'l Syndication*, 2005 WL 104114, at *14 (S.D.N.Y. May 5, 2005); *see also McCarthy on Trademarks and Unfair Competition* § 30:2 ("A compulsory trademark license imposed by a court is not permitted by the GATT TRIPS international trade agreement."); North Atlantic Free Trade Agreement, art. 1708(11) ("the compulsory licensing of trademark shall not be permitted").

12022119-2

(citing *Telecordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378-79 (Fed. Cir. 2010) ("Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate.").

9. Thus, there is no reasonable basis to believe that the Arbitrator intended to create a "compulsory license" (or any other license), because the Award does not actually give Plaintiffs the right to use *Orange Bang's* mark. Instead, the Award mandates compensation for continued infringement of Orange Bang's mark through Plaintiffs' use of its own mark, similarly to patent law. *See* Award 148 ("Here, the equitable discretion authorized by the statute under trademark law is analogous to the equitable discretion authorized under patent law. Likewise, the same policy concerns apply. If Plaintiffs are not ordered to pay an ongoing royalty in the future, or the Permanent Injunction is not in place, then there is a strong risk that trademark infringement will continue and future, duplicative litigation will ensue."); *see also id.* at 149 (noting that the purpose of the Award's "5% reasonable royalty [is] to prevent future harm").[6]

**B.  The Award Does Not Include Any Quality Control Provisions**

10. Quality control provisions are an essential component to every valid trademark license. *See In re Impact Distributors*, 260 B.R. 48, 55 (S.D. Fla. 2001) ("A valid [trademark] licensing agreement provides for adequate control by the licensor over the quality of the goods or

---

[6] What is more, courts under patent law have found that ongoing royalty obligations, which are equitable in nature, extend to the infringer's successors and assigns. *See Mondis Tech. Ltd. v. Chimei Innolux Corp.*, 2012 WL 1554645, at *7 (E.D. Tex. Apr. 30, 2012) ("[T]he Court is persuaded that an award of ongoing royalties is equitable in nature and exists as a form of injunctive relief that may properly extend to successors and assigns. While this Court recognizes that applying ongoing royalties to successors and assigns may conflict to some degree with the principle that royalties are dependent upon the specific positions and bargaining power of the parties, the Court believes that the alternative of adopting a blanket rule that ongoing royalty payments terminate when an infringer changes legal status or sells a portion of its business would eviscerate the purpose of ongoing royalties as a remedy in lieu of a prohibitory injunction. Otherwise any adjudicated infringer could simply spin-off or sell its infringing line of business to a competitor and completely avoid that infringing line of business' obligation to pay ongoing royalties. The failure to extend ongoing royalties to successors and assigns would in practice make them a nullity, and every first year law student knows that the law abhors a nullity and demands that such be avoided wherever possible.").

services produces under the mark by a licensee.") (citing *Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (C.C.P.A. 1978) (quotes omitted); *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788, 791 (7th Cir. 2011) ("Trademark law requires that decisionmaking authority over quality remains with the owner of the mark."); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:48 (5th ed.) ("A trademark or service mark can be validly licensed to another to use but only if the licensor exercises control over the nature and quality of the goods and/or services sold by the licensee under the licensed mark."). The Award contains *no* quality control provisions. In fact, the plain language of the Award imposes no restrictions whatsoever on how Plaintiffs use the mark. *See* Award 175 (Imposing the royalty election "for so long as VPX or JHO make *any use* of the BANG mark").

11. Defendants offer unconvincing responses. ***First***, they argue that Plaintiffs are precluded from raising the issue. *See* Obj. ¶ 42. But Plaintiffs do not, in this forum, contest the validity of the remedy imposed by the Award. The point is that the remedy cannot be a trademark license because it lacks an essential component of trademark licenses that *every* trademark license must have. Similarly, Defendants argue that Plaintiffs are estopped from arguing that if the Award created a license, it would be a naked license. *See* Obj. ¶ 45. But again this misses the point, which is that the absence of the quality control provisions means that the Award created a remedy that is *not* a license.

12. ***Second***, Defendants argue that Plaintiffs cite "no authority for the proposition that that licenses cannot be award[ed] as a judicial remedy in otherwise appropriate circumstances without alleged 'quality control' rights." Obj. 44. This argument proves too much, because there is no evidence that judicially imposed trademark licenses exist *at all*. *See McCarthy on Trademarks and Unfair Competition* § 30:2. But even if that were not the case, Defendants provide

7

no reason why a judicially imposed license would not require quality control provisions just like any other license, given that quality control provisions are essential to protect *consumers*. *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959) ("If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark.").

13. Defendants also argue that it would be absurd for the Award to impose a remedy that ultimately would lead to Defendants' abandonment of their trademark. *See* Obj. ¶ 44. Plaintiffs *agree*. If the Award created a trademark license, it affirmatively licensed more confusion and infringement (rather than establishing compensation for that "future harm" (*see* Award 148-49)). The purpose of quality control in licensing is to *prevent* confusion by standardizing the products sold under a particular mark.[7] But here the Award permits Plaintiffs to *continue* infringing by selling their own products under their own mark without any control whatsoever by Defendants. Thus, if the Award created a license, the Award will necessarily have put Defendants at risk of abandoning their mark as a result of its being a naked license.

14. **Finally**, Defendants argue that the "courts have held that a licensor's control over quality may be sufficiently shown when a licensee maintains the quality of goods distributed under the at-issue trademarks." Obj. 46. This is true, but only under very limited circumstances that do not apply here, namely when there is "(1) a close working relationship for eight years; (2) a licensor who manufactured ninety percent of the components sold by a licensee and with whom it

---

[7] *See Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977) ("The rationale for this requirement is that marks are treated by purchasers as an indication that the trademark owner is associated with the product. Customers rely upon the owner's reputation when they select the trademarked goods. If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device.").

had a ten year association and knew of the licensee's expertise; (3) siblings who were former business partners and enjoyed a seventeen-year business relationship; and (4) a licensor with a close working relationship with the licensee's employees, and the pertinent agreement provided that the license would terminate if certain employees ceased to be affiliated with the licensee." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 518 (9th Cir. 2010). Plaintiffs and Defendants do not have a "close working relationship," they are competitors and chronic litigation adversaries.

15. In fact, they are combatants on the very issue of the quality of Plaintiffs' products. In 2018, Monster commenced litigation against VPX alleging that "VPX is yet again engaging in a deliberate and deceptive marking campaign, which involves making repeated false and/or misleading statements to boost the position, appeal and sales of its BANG energy drinks." Complaint ¶ 11, *Monster Energy Co. v. Vital Pharm., Inc.*, No. 5:18-cv-01882 (C.D. Cal. Sept. 4, 2018) (the "Monster Complaint"). The Monster Complaint went further, asserting that VPX "h[as] waged a nationwide advertising and marketing campaign that falsely promotes the health benefits and quality of BANG. As demonstrated herein, there are no limits to what [VPX] will say to unlawfully increase sales and promote BANG." Finally, the Monster Complaint directly attacked the *quality* of Plaintiffs' products. *See, e.g.*, Monster Complaint ¶ 38 ("VPX claims that BANG is a 'health promoting beverage' for 'health enthusiasts,' but instead it contains almost all artificial ingredients."). Monster continued to prosecute these same claims during and after the Arbitration. Defendants' suggestion that they chose to do business with Plaintiffs based on their "familiar[ity] with the past use and quality standards VPX maintains, which Plaintiffs themselves maintain 'are exceptionally high quality standards,'" Obj. ¶ 47, is incredible.

12022119-2

16. Given this background, and the Arbitrator's stated attempt to address concerns regarding future conduct, the Award's failure to include quality control provisions is even more telling. The Arbitrator "took the opportunity to clarify potential ambiguities or loopholes" to prevent Plaintiffs from circumventing the Award's provisions. *See* Award 144; *see also id.* at 143 ("clarifying guidance to the parties in this Final Arbitration Award is especially appropriate in this case given Orange Bang's stated concern" about VPX's potential future conduct). Yet, Defendants now argue that the Arbitrator intended to create a trademark license while both failing to include a provision essential to actually create a trademark license, and which provision also would have furthered the Arbitrator's expressly stated aim of protecting Orange Bang's trademark rights. Especially given the circumstances, the Arbitrator's failure to include quality control provisions strongly suggests that the Award is not intended to be a license.

17. For all of the foregoing reasons, and those explained in Plaintiffs' Motion, neither the 5% Continuing Royalty Election nor the Award as a whole is, or creates, a trademark license. Given the absence of any trademark license, Defendants have no basis for consent rights over the transfer of the 5% Continuing Royalty Election to a purchaser.

## II. THE SECTION 365(C) RESTRICTIONS DO NOT APPLY BECAUSE NEITHER THE AWARD NOR THE 5% CONTINUING ROYALTY IS AN EXECUTORY CONTRACT

18. In addition, far from being a trademark license, neither the 5% Continuing Royalty Election nor the Award as a whole is even an executory contract—which makes any restrictions on assignment inapplicable.

19. To begin with, it is well settled that "the phrase 'executory contract' cannot be applied to a judicial order." *In re Bennet Enters., Inc.*, 628 B.R. 481, 487 (Bankr. D.N.J. 2021) (citations omitted). Defendants point out that judicial orders incorporating an agreement between parties are treated like contracts. *See* Obj. 62. But Defendants only cite examples where the

12022119-2

agreement was the result of bargaining between the parties, such as a settlement agreement. *See* Obj. ¶ 61 (citing *In re Columbia Gas Sys., Inc.*, 50 F.3d 233, 237-38 (Cir. 3d 1995) (considering settlement agreement) and *In re W.B. Care Ctr., LLC*, 419 B.R. 62 (S.D. Fla. 2009) (same)). There is a clear and obvious distinction between picking an election and bargaining for the terms of an agreement that ultimately get incorporated into a judicial order.

20. But, even if a judicial award like the Award were a contract, it is not an executory contract. Defendants acknowledge that an executory contract requires material unperformed obligations owed by both parties. *See* Obj. ¶ 56 (citing *Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) ("A contract is executory if performance remains due to some extent on both sides.")). Defendants conclude that the 5% Continuing Royalty Election is an executory contract because it is a trademark license, which are "almost invariably considered to be executory contracts," Obj. ¶ 57, and because Defendants have made "the implicit agreement not to sue Plaintiffs." But Defendants misstate the reality: Defendants have not implicitly promised not to sue; Defendants *cannot* sue, because they are barred by res judicata. Any promise not to sue would be illusory consideration. But even if res judicata did not apply, Defendants cite no case law for the existence of an "implicit agreement not to sue," and moreover, that such an implicit agreement constitutes a material unperformed obligation that can factor into an executory contract analysis. Indeed, Defendants cite no case where an alleged obligation *not set forth* in the agreement is a material obligation at all.

21. More importantly, Defendants' assertion that the Award or the 5% Continuing Royalty Election is an executory contract is absurd because it would allow the Debtors to reject the Award under section 365(a), reduce the Award and all obligations thereunder to a prepetition

11

claim under section 365(g), and render the Award, the 5% Continuing Royalty Election, and all findings of fact and conclusion of law a nullity.[8]

### III. DEFENDANTS ARE PRECLUDED FROM RELITIGATING THE USE OF PLAINTIFFS' BANG MARK

22. Far from being a trademark license, or an executory contract of any kind, the 5% Continuing Royalty Election is simply a component of a confirmed Award that will travel with the Debtors' mark and their business as a whole to a purchaser of the Debtors' business.

23. The parties all agree that res judicata precludes a litigant from asserting a claim "when (1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases." *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 30 F.4th 1079, 1083 (11th Cir. 2022). Defendants concede satisfaction of the first two factors, instead focusing their dispute solely on the last two factors.

#### A. Defendants Argue Lack of Privity By Confusing Plaintiffs' Mark With a Trademark License

24. It is black letter law that a final judgment with respect to a particular property interest, including a trademark, is binding on a third-party assignee of that property interest.[9] This is the essence of being in privity, "which is simply a shorthand way of saying that the nonparty will be bound by the judgment in that action." *Int'l Nutrition Co.*, 220 F.3d at 1329. Plaintiffs

---

[8] *See* note 6, *supra*.

[9] *See Int'l Nutrition Co. v. Horphag Rsch., Ltd.*, 220 F.3d 1325, 1329 (Fed. Cir. 2000) ("[A] judgment with respect to a particular property interest may be binding on a third party based on a transfer of the property in issue to the third party after judgment."); *Kloster Speedsteel AB v. Crucible Inc.*, 1986 WL 721181, at *21 (Fed. Cir. June 11, 1986) (stating that courts routinely find privity where "a nonparty acquires assets of a defendant-infringer"); *Restatement (Second) of Judgments* § 43(1)(b) ("[a] judgment in action that determines interests in real or personal property, [w]ith respect to the property involved in the action[, h]as preclusive effects upon a person who succeeds to the interests of a party to the same extend as upon the party himself").

have an ownership interest in their Bang mark, which is federally registered to JHO.[10] The parameters of how Plaintiffs may use their Bang mark were adjudicated on a final basis under the Award. Accordingly, there can be no reasonable dispute that privity applies as between Plaintiffs and any buyer of substantially all of the Debtors' assets.

25. Defendants respond by saying that Plaintiffs seek to assign a trademark *license*, that privity can only exist if that trademark license is assignable, and if the trademark license is not assignable then the purported assignee would not hold any rights to the trademark, and there would be no privity. Obj. ¶ 86. This is not an actual response, but merely a recitation of incorrect facts. Plaintiffs seek a determination that res judicata applies with respect to use, and restrictions on use, of the Bang mark owned by, and registered to, *Plaintiffs*. There is no legitimate basis to dispute assignability of Plaintiffs' mark. *See, e.g.*, *In re Roman Cleanse Co.*, 43 B.R. 940, 947 (Bankr. E.D. Mich. 1984) ("A trustee in bankruptcy may assign [the debtor's] trademark."). The question is not whether Plaintiffs seek to transfer a trademark license, or whether they seek to transfer the Award. It is whether the parameters for how Plaintiffs may use their Bang mark, which were adjudicated on a final basis under the Award, are binding on the buyer.[11]

26. Ultimately, Defendants have the issue backwards. If res judicata applies, there is no issue of assignability because res judicata necessarily binds a successor to a prior judgment without any assignment of the judgment itself. Defendants' argument, therefore, requires not only that the Award creates a trademark license, but also that the confirmed Award is not even a judicial determination. Instead, Defendants necessarily argue that the Award creates a trademark license

---

[10] *See* Registration Nos. 3545129; 5884629; and 6933743.

[11] Indeed, it was on this very basis that the California District Court determined that JHO was subject to the Arbitration, because VPX "assigned its right in the trademark 'B[ang]' to JHO [and] VPX then entered into a Trademark License Agreement with JHO on July 13, 2017 for the right to use the Bang word mark." *See* Order Compelling Arbitration 10-11, D.C. ECF No. 50.

12022119-2

that incorporates a judgment, rather than a judgment that, according to Defendants, incorporates a trademark license. In other words, Defendants appear to argue that res judicata cannot apply because the *judgment* is actually a trademark license that cannot be transferred. That is not how res judicata works. And, if it is, then the entire Award must not apply to a purchaser, and the findings of infringement and breach of contract are a nullity.

B. **Any Infringement Claims Against a Buyer Would Be the Same Cause of Action Adjudicated Under the Award**

27. Defendants do not contest that determining whether the causes of action are the same is whether the primary right and duty are the same in each case. "In determining whether the causes of action are the same, a court must compare the substance of the actions, not their form." *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1239 (11th Cir. 1999) (quoting *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1503 (11th Cir. 1990) (quotes omitted). That is, "a court must look to the factual issues to be resolved in the second cause of action, and compare them with the issues explored in the first cause of action." *Citibank*, 904 F.2d at 1503. "If a case arises out of the same nucleus of operative facts, or is based upon the same factual predicate, as a former action, the two cases are really the same 'claim' or 'cause of action' for purposes of res judicata." *Griswold v. County of Hillsborough*, 598 F.3d 1289, 1293 (11th Cir. 2010).

28. The Award addressed whether Plaintiffs' mark infringed on Orange Bang's mark, and imposed an ongoing royalty to prevent further duplicative litigation. *See* Award 148. The Debtors contemplate selling substantially all of their assets, including their rights in the Bang word mark, goodwill, and other intangible assets associated with the Debtors' business, as well as the Debtors' distribution network, production facilities, marketing apparatus, and every other component that goes into successfully marketing and selling Bang Products. In other words, the same business will be run by a new operator. Any future lawsuit by Defendants against a purchaser

12022119-2

asserting infringement by the purchaser's operation of the same business in the same manner would rely on the same facts.

29. Defendants provide three responses. **First**, they say that Plaintiffs seek "an advisory opinion." Obj. ¶ 87. This is wrong. Plaintiffs seek, by declaratory judgment, to establish their rights with respect to their Bang mark, including understanding whether they can assign those rights to a third-party buyer. This is exactly the sort of thing that is permitted under the Declaratory Judgment Act.[12] **Second**, Defendants argue that they could bring different claims against Plaintiffs or a buyer, including that the transfer of the 5% Continuing Royalty Election was invalid and null and void. *See* Obj. ¶ 88. But those issues are being litigated in the instant cause of action, and thus Defendants would necessarily be precluded from bringing the same claim in the future. And, moreover, assignability of Plaintiffs' rights are exactly what Plaintiffs seek to determine now.

30. **Finally**, Defendants assert that they could bring trademark claims against a buyer because "any purported assignee has yet to sell a single can of Bang." See Obj. ¶ 89. But Defendants do not explain how, if a buyer runs the *same* business selling the same products as the Debtors, any of the facts would be different. Defendants could not bring the same claim against Plaintiffs before they sell their next Bang-branded can, and it would be no different if that next sale was made by the buyer as the new owner of the Debtors' business. There is nothing about a change in ownership that materially alters the fact pattern.

---

[12] *See Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.")

## IV. THE 5% CONTINUING ROYALTY ELECTION CAN BE ASSIGNED WITHOUT DEFENDANTS' CONSENT

31. Even if Plaintiffs are wrong and res judicata does not provide a complete answer to the present dispute *and* the 5% Continuing Royalty Election or Award is viewed as an executory trademark license, it is still assignable without consent as a matter of law.

### A. If the Award Is a License, It Is a Freely Assignable Compulsory License

32. Defendants argue that the Court must follow "express language of the Award, which unequivocally refers to the remedy as a 'license.'" Obj. 31 (emphasis omitted). But Defendants cannot simply ask the Court to follow the express language of the Award and then ignore that the Award calls the remedy a "compulsory license." *See* Award 150 ("the arbitrator is granting a **compulsory** license") (emphasis added). This difference in the language matters. A compulsory license is a term of art used under patent law to refer to a remedy that is freely assignable. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313 n.13 (Fed. Cir. 2007) ("The term 'compulsory license' implies that *anyone* who meets certain criteria has . . . authority to use that which is licensed."). In addition, patent law clearly distinguishes between compulsory licenses and licenses. *See, e.g., Finisar Corp. v. DirecTV Grp., Inc.*, 2006 WL 7350655, at *2 (E.D. Tex. Sept. 27, 2006) ("the court denies [plaintiff's] request to treat royalties under a compulsory license the same as royalties under a voluntary license").

33. That the Arbitrator considered "comparable industry license agreements" does not demonstrate, as Defendants argue, that he intended create a trademark license. *See* Obj. ¶ 32. The Arbitrator also looked at "comparable licensing deals entered into by third parties in the beverage industry" to determine damages for *past* infringement, but that does mean *that* remedy was intended to be a license also. Instead, it suggests that looking at comparable licenses is the appropriate way to fashion a reasonable remedy for both past and future damages. *See, e.g., Paice*

16

504 F.3d at 1315 ("[T]he district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement.").

34. Accordingly, to the extent the 5% Continuing Royalty Election is a license, it is a compulsory license freely assignable by Plaintiffs.

**B.  Assuming the 5% Continuing Royalty Is a Trademark License and Also Is Not a Freely Assignable Compulsory License, the General Policy Reasons for Prohibiting Non-Consensual Assignment of Trademark Licenses Do Not Apply**

35. When engaging with the general prohibition on assigning trademark licenses without the licensor's consent, "it is not sufficient to simply recognize a general ban on contract assignment under the applicable non-bankruptcy law, the Court must understand why the applicable non-bankruptcy law bans assignment." *See In re Trump Ent. Resorts, Inc.*, 526 B.R. at 123 (citing *In re Catapult Ent., Inc.*, 165 F.3d 747, 752 (9th Cir. 1999). "[F]ederal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor." *See In re Trump Ent. Resorts, Inc.*, 526 B.R. at 124.

36. Defendants offer no reasons for why the 5% Continuing Royalty cannot be assigned without their consent other than that "trademarks are 'personal.'" Obj. 50. This is hardly a sufficient answer, and completely ignores the directive to look at "why the applicable non-bankruptcy law bans assignment." *In re Trump Ent. Resorts, Inc.*, 526 B.R. at 124. So, while generally speaking trademarks may be "personal," that is not true here, where the 5% Continuing Royalty Election fails to impose *any* quality control on Plaintiffs' products, which are completely different from Defendants' products. Indeed, Defendants have *never* had any control whatsoever over any aspect of Plaintiffs' products.

17

37. Defendants' failure to address how their alleged "personal" trademark interests align with trademark's policy "to inform potential buyers who makes the goods on sale," *Top Tobacco, L.P. v. N. Atl. Op. Co.*, 509 F.3d 380, 381 (7th Cir. 2007), is telling. Defendants do not provide an answer because they cannot provide an answer. The 5% Continuing Royalty Election cedes any right of Orange Bang to control Plaintiffs' manufacture and sale of Bang branded products in order to avoid confusion. Indeed, the Arbitrator determined that Orange Bang established a likelihood of confusion as between Orange Bang's "Orange Bang" product and the VPX Bang branded products." Award 79-80. Thus, by granting the 5% Continuing Royalty Election, the Arbitrator rendered irrelevant any of the concerns of customer confusion that trademark law's general prohibition against non-consensual assignments seeks to protect against.

38. Because the only policy considerations that generally apply have to do with allowing the trademark holder to control quality in order to prevent customer confusion, Orange Bang does not have any cognizable interest in prohibiting Plaintiffs from assigning their rights under the 5% Continuing Royalty Election. Rather, the only rights Orange Bang has under the 5% Continuing Royalty Election is to receive the 5% Continuing Royalty or, if it does not receive the 5% Continuing Royalty payments, to enjoin the sale of Bang branded products—regardless of whether the sellers are Plaintiffs or their assignees. Orange Bang has no other rights or obligations. Either the buyer will pay the 5% Continuing Royalty or be enjoined from selling Bang branded products. In either case, Orange Bang's rights and interests under the 5% Continuing Royalty Election will be fully protected.

## CONCLUSION

39. For all the foregoing reasons, Plaintiffs respectfully request that the Court enter an order granting the relief requested in the Motion and such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: March 24, 2023<br>Miami, Florida | Respectfully submitted,<br><br>/s/ Jordi Guso |

| | |
|---|---|
| George A. Davis (admitted *pro hac vice*)<br>Hugh K. Murtagh (admitted *pro hac vice*)<br>Tianjiao ("TJ") Li (admitted *pro hac vice*)<br>Brian S. Rosen (admitted *pro hac vice*)<br>Jonathan J. Weichselbaum (admitted *pro hac vice*)<br>**LATHAM & WATKINS LLP**<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Telephone: (212) 906-1200<br>Email: george.davis@lw.com<br>hugh.murtagh@lw.com<br>tj.li@lw.com<br>brian.rosen@lw.com<br>jon.weichselbaum@lw.com | Jordi Guso<br>Florida Bar No. 863580<br>Michael J. Niles<br>Florida Bar No. 107203<br>**BERGER SINGERMAN LLP**<br>1450 Brickell Avenue, Suite 1900<br>Miami, FL 33131<br>Telephone: (305) 755-9500<br>Email: jguso@bergersingerman.com<br>mniles@bergersingerman.com |

- and -

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone: (202) 637-2200
Email: andrew.sorkin@lw.com

– and –

Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email: whit.morley@lw.com

*Co-Counsel for Plaintiffs/Debtors*